# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| vPersonalize Inc., | Case No.: 2:18-CV-01836-BJR |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |
| Magnetize Consultants Ltd. (*dba* Kit Builder), | |
| Defendant. | |

## I.    INTRODUCTION

This matter comes before the Court on a Motion to Dismiss filed by Defendant Magnetize Consultants, Ltd., *dba* Kit Builder ("Kit Builder"). The First Amended Complaint ("FAC") filed by Plaintiff vPersonalize, Inc. ("vPersonalize") concerns U.S. Patent Nos. 9,345,280 ("the '280 Patent") and 9,661,886 ("the '886 Patent").[1] *See* FAC, Dkt. No. 22. Counts I and III of the FAC allege direct and indirect infringement of the patents, Count IV invokes the federal Defend Trade Secrets Act, and Count V claims Magnetize has violated the Washington Unfair Trade Practices Act. By this motion, Defendant seeks dismissal of all counts. Having reviewed the briefs filed in

---

[1] Based on Plaintiff's representation to the Court that it was no longer asserting infringement of U.S. Patent No. 9,406,172 as set forth in Count II of the FAC, the Court dismissed that count. *See* Order Re: Motion to Compel, Dkt. No. 95.

support of and opposition to the motion, the record, and the relevant case law, the Court rules as follows:

## II.     BACKGROUND

At issue are two patents, both concerning methods of automating the design and manufacture of custom-printed apparel and accessories. All facts alleged by Plaintiff are taken as true for the purposes of this motion.

### A.  The '280 Patent

The '280 Patent is described as a method for "Using UV Unwrapping to Create Manufacturing Patterns for Custom Prints." '280 Patent, Title, Dkt. No. 22-1. The patent is "a method for automating the generation of manufacturing patterns for apparel and accessories, incorporating custom images or text designed by a user directly onto a computerized three-dimensional (3D) model." *Id*. at Abstract. The process describes the allegedly novel use of "UV unwrapping" and "UV mapping"—that is, in this context, a two-dimensional representation (or "map") of three-dimensional apparel (*e.g.*, t-shirts, backpacks)—based on the shapes of traditional manufacturing patterns.[2] In the words of the patent, the "invention outlines a method for automating the generation of manufacturing patterns directly from designs created on a 3D model by 1) making the UV map of the 3D model exactly match the manufacturing pattern in shape and scale (or size). 2) Placing various components in the UV map to facilitate the desired image or text flow 3) Designing on the said model and using any UV unwrap method or image cutting method to get the manufacturing patterns with the exact art and text on each component." *Id*., Col. 1:40-46.

---

[2] Wikipedia defines "UV mapping" as "the 3D modelling process of projecting a 2D image to a 3D model's surface for texture mapping. The letters "U" and "V" denote the axes of the 2D texture because "X", "Y", and "Z" are already used to denote the axes of the 3D object in model space." *See* https://en.wikipedia.org/wiki/UV_mapping#UV_unwrapping

The following images from the patent help illustrate the concept of generating a UV map from a 3D model of a shirt, whereby the map is "a direct projection of the 3D model." Figure 1 depicts "A typical 3D model (101) and its UV map (102)":



101



102

'280 Patent, Fig. 1. The patent asserts that "there is no way to map what is on the 3D model" complete with the customized design (artwork, text, logos, etc.) applied by a user, "back to a manufacturing pattern (3D to pattern) suitable for making that apparel or accessory." Thus, the patent's proposed solution is to model the UV map of an apparel after a typical manufacturing sewing pattern of that apparel, which may look, for example, like the image below at Figure 2 in the patent:



*Id.*, Fig. 2. In other words, the process described in the patent instructs that the UV map be modeled to replicate the shapes of the various components (front, back, sleeves, etc.) of the chosen manufacturing pattern:



*Id.*, Fig. 3. A person using the process thus may apply customized images or text, using a computer, directly onto the 3D model of the garment and, following the method described in the patent, the UV map may be unwrapped from the 3D model, into shapes exactly matching the various components of a manufacturing pattern, with the customized design printed on the pattern, as, for example, in the following Figure 5 of the patent:



*Id.,* Fig. 5. Using this method, the patent states, "[i]mages and text are thereby allowed to span across seams and be accurately manufactured. Automation of this process ensures that the images and text on the manufacturing patterns are the exact same as that which the user designed." *Id.* at Abstract.

## B. The '886 Patent

The '886 Patent has one independent claim and five dependent claims, also relating to the automation of custom-designed apparel, directed to a computer-implemented "system and method for capturing design state of apparel or accessory to enable extrapolation for style and size variants." '886 Patent, Title, Dkt. No. 22-3. According to the '886 Patent, the invention "outlines a novel method for capturing the state of an intended design on an apparel pattern, and subsequently transforming that state to a new style or size and then applying that modified state to automatically recreate the original design, but for the new style or size. This invention captures the state of a design as a mathematical function, rather than the design itself and then applies a series of transformations to that state to map it to a new style." *Id.* at Abstract.

The patent claims individual elements outlining a series of instructions for the steps for expressing the original design state as a mathematical function, and calculating and applying

ORDER RE: MOTION
TO DISMISS

various transformations to that function (using a computer) to achieve the desired result. The patent does not describe how to achieve the mathematical function representing the design state except to say it is "characterized by at least the position of the design pattern on the garment component, the (background and foreground) color of the design pattern, art or image used in the design pattern, text used in the design pattern, font of the text used in the design pattern, scale factor associated with the design pattern, translation factor associated with the design pattern, rotational angles associated with the design pattern, design layers associated with the design pattern." '886 Patent, Col. 2 l. 61- Col. 3 l. 2. The patent also does not identify what the translation factors are, or in any specific way how they should be calculated, other than to say a computer should be used to calculate them "based at least on the original height, original width, alteration height and alteration width" of the original and target garment and designs, relying on "scaling factors" obtained by comparing the measurements of an original and target garment. *Id*., Col. 4, ll. 31-44.

The claimed advantage of this automated method is that it "enables designers to seamlessly extrapolate designs across apparels and accessories of various sizes and styles" and "obviates the need for creating individual design for each style or size, while ensuring that the transformed designs retain their visual characteristics even upon extrapolation." *Id*. at Abstract.

### C. The Parties and the Allegations

In its First Amended Complaint, Plaintiff alleges that Kit Builder is a United Kingdom-based business, which offers its products and services to customers, business affiliates and partners located in the United States. FAC ¶ 5. Kit Builder sells custom clothing designer software called "3D Kit Builder," which allows a user to design garments with different options for color, logos, text, embellishment, size, etc. *Id*. ¶ 12. The software allows users to, among other things, design a three-dimensional model of a garment and automatically generate the manufacturing patterns for

the garment with the corresponding design, and to add text or logos to a garment, adjusting designs for size, type of garment, etc. (e.g. from size small to large, or from a woman's shirt to a backpack). Plaintiff claims the software infringes the two remaining patents-in-suit. *Id.* ¶¶ 14,16.

## III. DISCUSSION

Defendant seeks dismissal of all remaining counts in the First Amended Complaint, on various alternative grounds. Defendant first argues that Counts I and III (direct and indirect infringement of the '280 and '886 Patents, respectively) should be dismissed because the patents are directed to ineligible subject matter. Further, even if the patents withstand this scrutiny, Defendant argues, Count III (the '886 Patent) should be dismissed as inadequately pled.[3] Defendant additionally argues that Counts I and III are inadequately pled, specifically as to Plaintiff's indirect infringement claims. Finally, Defendant seeks dismissal of Count IV (alleging violation of the federal Defense of Trade Secrets Act) and Count V (alleging violation of the Washington Uniform Trade Secrets Act), arguing the two laws cannot be applied extraterritorially.

### A. Motion to Dismiss Standard

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677-78. "A pleading that offers 'labels and

---

[3] Defendant's motion also seeks dismissal of Count II, which has subsequently been voluntarily dismissed, and therefore is not discussed in this Order. In addition, because the Court dismisses Count III on patent-ineligibility grounds, as discussed below, it need not and does not discuss Defendant's request to dismiss this count based on inadequate pleading.

ORDER RE: MOTION
TO DISMISS

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' ... Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. at 678, quoting *Twombly*, 550 U.S. at 555, 557.

When considering a motion to dismiss under Rule 12(b)(6), the court construes the complaint in the light most favorable to the nonmoving party, accepting all well-pleaded facts as true and drawing all reasonable inferences in the non-moving party's favor. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 135 F.3d 658, 661 (9th Cir. 1998). The court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

While a court generally does not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion to dismiss, there are certain exceptions. Relevant to the instant motion, the court may consider documents appended to the complaint. *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir. 2003). In this case, the two patents at issue have been appended to the First Amended Complaint, which the Court therefore considers in the context of this motion.

Finally, "in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *FairWarning IP, LLC v. Iatric Sys., Inc*., 839 F.3d 1089, 1097 (Fed. Cir. 2016), quoting *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016). This is particularly true where—as here—neither party claims additional discovery or factual development is necessary for a decision. *See also Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced.").

ORDER RE: MOTION
TO DISMISS

**B. Counts I and III: Patent Eligibility Under *Alice/Mayo* Test**

1. Patent Eligibility of Abstract Concepts and the Two-Step Inquiry under *Alice/Mayo*

Defendant's motion seeks dismissal of both counts of patent infringement remaining in this case, arguing that the patents are directed to patent-ineligible concepts. Under 35 U.S.C. § 101, one may obtain a patent on "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." The Supreme Court has interpreted this deceptively simple formulation to exclude, by implication, concepts categorized as "laws of nature, natural phenomena, and abstract ideas." *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* 566 U.S. 66, 70 (2012), citing, *inter alia, Diamond v. Diehr,* 450 U.S. 175, 185 (1981). These things are not patent-eligible, because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Mayo*, 566 U.S. at 71, citations omitted. Granting patents to such concepts would "tend to impede innovation more than it would tend to promote it," thereby thwarting the primary object of the patent laws. *Id*.

After a string of decisions outlining patent-ineligibility jurisprudence, the Supreme Court in *Alice Corporation Party Ltd. v. CLS Bank International* attempted to guide lower courts by prescribing a more focused inquiry into whether a concept is patent-eligible. 573 U.S. 208, 216-18 (2014). In *Alice*, the court elaborated on a two-step test that had emerged in *Mayo*, under which a court must first "determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 573 U.S. at 218. It should be noted that what is "abstract" continues to elude precise definition, perhaps particularly in the context of software patents. *See Alice,* 573 U.S. 208 at 221 ("we need not labor to delimit the precise contours of the 'abstract ideas' category in this case."); *Amdocs (Israel) Limited v. Openet Telecom, Inc.,* 841 F.3d 1288, 1294 (2016) ("a search for a single test or definition [of 'abstract idea'] in the decided cases

concerning § 101 from this court, and indeed from the Supreme Court, reveals that at present there is no such single, succinct, usable definition or test."); *see also Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343–44 (Fed. Cir. 2018) ("Computer software-related inventions—due to their intangible nature—can be particularly difficult to assess under the abstract idea exception.").

Nevertheless, it is useful to bear in mind that the "abstract ideas" category embodies "the longstanding rule that '[a]n idea of itself is not patentable.'" *Alice*, 573 U.S. at 218, citations omitted. The task of a court is to "distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more." *Id.* at 217, citing *Mayo*, 566 U.S. at 71, 73. For cases such as this involving software, the step one inquiry "often turns on whether the claims focus on the specific asserted improvement in computer capabilities or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* (internal quotation marks, alterations, and citations omitted).

If the court determines the claims at issue are directed to an abstract idea, at step two the court considers the elements of each claim "both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application." *Alice* at 217. Step two is "a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* In order to supply an inventive concept, elements of a claim "must be more than well-understood, routine, conventional activity," "and cannot simply be an instruction to implement or apply the abstract idea on a computer." *See Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016), citing *Mayo*, 566 U.S. at 79. At a minimum, the claim must apply conventional technological elements in a novel and unconventional way and not merely use a computer as a

ORDER RE: MOTION
TO DISMISS

"tool" to implement an abstract idea. *See, e.g., Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-01 (Fed. Cir. 2016) ("The solution requires arguably generic components. . . . However, the claim's enhancing limitation necessarily requires that these generic components operate in an unconventional manner to achieve an improvement in computer functionality."); *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349-52 (Fed. Cir. 2016). It is not sufficient to simply use "already available computers, with their already available basic functions, ... as tools in executing the claimed process." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1169-70 (Fed. Cir. 2018).

Finally, courts must "tread carefully" when wielding this invalidity tool, since "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 573 U.S. at 217. With this framework in mind, the Court turns to the two patents at issue in this case.

2. The '280 Patent

As outlined above, the '280 Patent describes a method for "using UV unwrapping to create manufacturing patterns for custom prints." Dkt No. 22-1, Title. Specifically, Claim 1, which is the only claim disclosed in the '280 Patent, recites:

> A method for allowing a user to design on a 3D model of an apparel or accessory and automatically generating the manufacturing patterns for the said apparel or accessory with the corresponding design, comprising the following steps:
>
> Creating the 3D model wherein the UV map of the said model exactly matches the corresponding manufacturing pattern in shape & scale; and
>
> Arranging the various components of the 3D model in the UV map to facilitate the desired image or text flow; and
>
> Designing on the said 3D model; and

ORDER RE: MOTION
TO DISMISS

Using any method of UV unwrapping or image cutting to get back the UVs (and consequently the manufacturing patterns) with the corresponding design composite.

Id., Cl. 1, Col. 3 ll. 12-25.

The question before the Court is whether the '280 Patent is directed to an abstract idea and, if so, whether it nevertheless contains an innovative concept that saves it under *Alice*. As noted above, the Step One inquiry considers the claim "in light of the specification" to determine "whether [its] character as a whole is directed to excluded subject matter." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). Here, the patent's "character as a whole" is directed to a method for "automatically generating manufacturing patterns" by using the specified technology of UV mapping that "exactly matches" manufacturing patterns, and using the UV unwrapping process to produce such patterns that reflect a user's custom design. Thus described and taking all of Plaintiff's allegations as true, the Court cannot say at this point that the patent is directed to an abstract concept under *Alice* and its progeny.

Defendant argues that the patent outlined above can be reduced to mathematical—that is, unpatentable—concepts, and constitutes a "process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool," precisely the sort of idea that courts have consistently found to be patent-ineligible. *Enfish*, 822 F.3d at 1336. According to Defendant, the elements of Claim 1 amount to little more than "data image manipulation" and describe a "purely conventional" process. Mot. to Dis. at 8. The Court disagrees. Taking all of Plaintiff's factual allegations as true as it must, the Court concludes that the '280 Patent "as a whole" amounts to more than mere mathematical manipulations. The patent describes a process by which an innovative component is added by *how* a computer is used, and not merely by the fact a computer is used.

ORDER RE: MOTION
TO DISMISS

Furthermore, the '280 Patent is not directed merely to an outcome or result, a problem that has doomed so many patents at step one of the *Alice* test. *See Diamond v. Diehr*, 450 U.S. 175, 182 n.7 (1981) (a concept is less likely to be abstract if it is directed to "the means or method of producing a certain result, or effect, and not for the result or effect produced."); *see also Enfish*, 822 F.3d at 1336 ("We therefore look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery."). Critically, the focus of the '280 Patent is a specific, non-abstract mechanism for achieving a result. The '280 Patent purports to be an improvement not merely because it calls for the use of a computer, but because it prescribes the steps, to a level of detail that resists abstraction, for how a computer should be used. This method as described includes the allegedly novel use of UV mapping—a specific and specialized technology—that when unwrapped, "*exactly matches*" the various pieces of a garment manufacturing pattern, including the user-applied designs. It is these limitations that draw the method out of the realm of the abstract, making the concept patent eligible under *Alice*.

Thus, the elements described in the '280 Patent are not abstract; on the contrary, they depict a fairly concrete series of specific rules, that when followed result in a tangible product: the desired manufacturing pattern, including the custom design. Because the patent is directed to a "new and useful technique" for achieving an end, it is not abstract. *See Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (holding that "claims directed to a new and useful technique for using sensors to more efficiently track an object on a moving platform" were not abstract); *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048, 1050 (Fed. Cir. 2016) (holding that claims directed to "a new and useful laboratory technique for preserving hepatocytes," a type of liver cell, were not abstract).

ORDER RE: MOTION
TO DISMISS

Because the Court concludes that Patent '280 is not directed to an abstract concept, further analysis of patent eligibility under *Alice* is unnecessary. Nevertheless, the Court notes that even if it could be said the '280 Patent is directed to an abstract concept, the patent also contains the additional "inventive concept" referenced in step two of the *Alice* analysis. *Alice*, 573 U.S. at 221. As described, the method in fact includes an additional "inventive concept," which purports to be "novel": the technique of UV mapping employed to automate the generation of manufacturing patterns for custom-designed apparel. *See Bascom*, 827 F.3d at 1350 (a "non-conventional and non-generic arrangement of known, conventional pieces" can amount to an inventive concept.).

Defendant argues that the patent itself concedes that the rules are "conventional." The patent indeed acknowledges that "[t]he concept of custom prints on apparel has been around for a long time;" that "[t]he method of designing on a 3D model is also not new," and further that "the use of UV maps for texturing and showing images on a 3D model has been around for decades. Almost all 3D editing software support the automatic generation of UV by projection, or other methods." '280 Patent, Col 1. ll. 13-35. According to the patent, however, UV unwrapping—a technology used in animation and video games for creating realistic textures on 3D figures on a screen—has "never" been used "for manufacturing automation" of apparel. *Id*. The process outlined in the patent purports to be an improvement to the traditional method of creating manufacturing patterns for customized apparel in that it invokes the novel use of this UV unwrapping technique, improving the efficiency and precision of generating the patterns. While the Court acknowledges the merits of Defendant's position, at this stage of the proceedings, the Court must accept these representations as true. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

### 3. The '886 Patent

The '886 Patent claims a "system and method for capturing design state of apparel or accessory to enable extrapolation for style and size variants." '886 Patent, Title. The process is one of capturing a "state" of a custom design as a mathematical function, and applying certain transformations to that function to transform the design onto various desired sizes and/or styles. Claim 1 of the patent discloses:

> A computer implemented method comprising instructions [stored and executed on a computer] for capturing a design status or condition corresponding to a design pattern embedded on a garment pattern or component and transforming captured design status or condition to incorporate dimensional or shape variations thereto, the method comprising the steps:
>
> identifying a design status or condition of a design representing one or more design patterns embedded on the garment component, and wherein the design status or condition of the design comprises at least an original height and original width of the one or more design patterns, and a first coordinate pair indicating a center point of the one or more design patterns;
>
> identifying an original height and an original width of the garment component, and further identifying an alteration height and alteration width corresponding to the garment component;
>
> calculating a scale factor, based at least on the original height, original width, alteration height and alteration width corresponding to the garment component; calculating a plurality of translation factors, based at least on the original height, original width, alteration height, alteration width corresponding to the garment component and the scale factor;
>
> providing at least the scale factor and the plurality of translation factors as inputs to the computing device through an input device/interface for an affine transformation operation, and executing the affine transformation operation on the design status or condition of the design;
>
> wherein the affine transformation is performed to modify and reposition each of the original design patterns to the altered width, height and position of the garment component.

The remaining Claims 2-6 are dependent on Claim 1, and elaborate on the steps of identifying the design status, modifying the original height and width, calculating the scale factors, and calculating the translation factors.[4]

As with analysis of the '280 Patent, the Court first examines the claim "in light of the specification" to determine "whether [its] character as a whole is directed to excluded subject matter." *Enfish*, 822 F.3d at 1335. The Federal Circuit has "cautioned that courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016), citations omitted. Thus the Court takes care to "account for the specific requirements of the claims" of the '886 Patent. Those "specific requirements" include characterizing the "design state" of a customized design as "at least the position of the design pattern on the garment component," plus the color, art, image, text, and font of the design pattern, and the "scale factor," "translation factor," "rotational angles," and "design layers" associated with the design pattern. '886 Patent, Col. 2 l. 60-Col. 3 ll. 2. The requirements further include storing and processing the captured design state on, essentially, a computer, and applying an "affine transformation" on the computer to the design state "to modify and reposition each of the original design patterns to the altered width, height and position of the garment component." *Id.*, Col. 3 ll. 61-64. The affine transformation comprises "[a]t least the scale factor and the plurality of

---

[4] Plaintiff does not argue in response to Defendant's motion for a claim-by-claim analysis of patent eligibility. The Court therefore does not embark on one. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (court need not expressly address each asserted claim where it concludes that particular claims are representative because all the claims are "substantially similar and linked to the same abstract idea."); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (Courts may "treat a claim as representative ... if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim.").

ORDER RE: MOTION
TO DISMISS

translation factors," which "are provided as inputs to the designer computing system through an input device/interface for an affine transformation operation." *Id.*, Col. 5 ll.14-18.

The Court has determined that the '886 Patent is directed to using a computer for capturing a design state as a mathematical formula and applying certain mathematical transformations to that formula, basing the transformations on the difference between the sizes and/or shapes of the original garments and the altered garments. The individual steps of Claim 1 add little to the claim, instructing only that the user identify the measurements associated with the original design, identify the measurements of the original garment, calculate the difference between the original and alteration garment, and apply translation factors, based on that difference, to the design. That the claim includes the step of using the height, width, and center point to measure the original design, for example, hardly supports Plaintiff's argument that this claim includes the critical "how" of this process. Indeed, it is difficult to imagine how else one might measure a design, other than by using, among other things, its height, width, and center point.

Based on this Claim, including the limitations recited therein, the Court holds that taken as a whole, the '886 Patent is directed to an abstract concept. At its core, the '886 Patent "invention" is no more than a "[a] process that start[s] with data, add[s] an algorithm, and end[s] with a new form of data," or, *in the words of the patent itself,* a process that "captures the state of a design as a mathematical function, rather than the design itself and then applies a series of transformations to that state to map it to a new style." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017); '886 Patent at Abstract. As such, it is "directed to an abstract idea." *Id.*

Plaintiff attempts to liken the '886 Patent to the patents at issue in *McRO, Inc. v. Bandai Namco Games*, which the Federal Circuit upheld. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). In that case, the plaintiffs were claiming a system and

ORDER RE: MOTION
TO DISMISS

method for automating the 3D animation of lip synchronization and facial expressions made during speech. The *McRO* patents sought to enable a computer to perform functions that previously only humans, using subjective judgment, could perform. Like the patent here, the *McRO* patents essentially translated design data into a mathematical function, and recited a set of instructions for transforming that data into new data. But the Federal Circuit in *McRO* reversed the district court's ineligibility determination for a specific set of reasons that are not present here.

First, the Federal Circuit noted that in the patents at issue, "the claims are limited to rules with specific characteristics." *McRO*, 837 F.3d at 1313. The rules proposed in the '886 Patent claim no such limitation. To the contrary, the '886 Patent explicitly claims the broadest universe of rules possible, stating that while the descriptions articulate certain details, "It should be understood, however, that the following descriptions, while indicating preferred embodiments and numerous specific details thereof, are given by way of illustration and not of limitation. Many changes and modifications may be made within the scope of the embodiments herein without departing from the spirit thereof and the embodiments herein include all such modifications," and later reiterating that "[t]he following detailed description is therefore not to be taken in a limiting sense." Patent at Col. 6:14-21 and 7:21-24. The patent repeatedly expands, not limits, the universe of rules that may be used. *See, e.g.,* '886 Patent, Claim 1, 12:23-25 (purporting to claim the method of identifying the design state of a pattern, which "comprises *at least* an original height and original width of the design patterns"), emphasis added.

What saved the patents in *McRO* is that they were directed to a limited "genus" of rules. 837 F.3d at 1313. The instructions disclosed in the '886 Patent, in fatal contrast, are "so broadly worded that it encompasses literally any form of data manipulation." *CyberSource Corp*., 654 F.3d at 1373; *see also Clarilogic, Inc. v. FormFree Holdings Corp*., 681 Fed. App'x 950, 954 (Fed. Cir.

ORDER RE: MOTION
TO DISMISS

2017) ("But a method for collection, analysis, and generation of information reports, where the claims are not limited to how the collected information is analyzed or reformed, is the height of abstraction."). This distinction is material because "the concern that drives [the] exclusionary principle" is that of "pre-emption." *Alice*, 573 U.S. at 216. As the Supreme Court explained in *Alice*, "Laws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work. Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws. We have repeatedly emphasized this ... concern that patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Id*, citing, *inter alia*, *Bilski*, at 611–612; U.S. Const., Art. I, § 8, cl. 8; internal quotations and citations omitted. In this case, according to the patent specifications, any improvement sought beyond what is articulated would presumably also be preempted by this insufficiently limited claim, implicating the concerns courts have repeatedly invoked about a patent on an abstract concept that "preempts" potential future improvements.

The *McRO* court also looked to whether "the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO*, 837 F.3d at 1314, citing *Enfish*, 822 F.3d at 1336; *see also Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc*., 827 F.3d 1042, 1048 (Fed. Cir. 2016). The Court upheld the patents because they were an "ordered combination of claimed steps, using *unconventional* rules." *McRO*, 837 F.3d 1299 at 1302–03, emphasis added. It was the "claimed rules, not the use of the computer," that "improved [the] existing technological process." *Id*., citing *Alice*, 573 U.S. at 223.

ORDER RE: MOTION
TO DISMISS

In contrast, to the extent they are defined at all, the rules described in the '886 Patent are mathematical formulas of a fairly elemental, abstract type, including division and multiplication of heights and widths. But claims reciting "[g]eneralized steps to be performed on a computer using conventional computer activity are abstract." *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (internal quotation marks omitted). Nor are the more sophisticated—but similarly generalized—scaling and rotational factors and affine transformations expressed in the '886 Patent an evident improvement in the "relevant technology." Plaintiff fails to point to anything in the specification that demonstrates that the recited rules are unconventional or an improvement on an existing method, other than they are implemented on a computer. Ultimately, what is disclosed in the '886 Patent is a "process that start[s] with data, add[s] an algorithm, and end[s] with a new form of data," precisely the kind of concept that is "directed to an abstract idea." *RecogniCorp,* 855 F.3d at 1327.

Thus, the '886 Patent also fails at *Alice* Step Two; the abstract idea embodied in the patent does not include any "innovative concept" that transforms it into "significantly more" than the original abstraction. *Alice*, 573 U.S. at 218. Unlike the '280 Patent, which employs the allegedly unconventional use of a specific technique (UV mapping and unwrapping) in a novel context (generation of manufacturing patterns), nothing disclosed in the '886 Patent appears or even purports to be novel, except the automation itself. But "[i]t is well-settled that placing an abstract idea in the context of a computer does not . . . convert the idea into a patent-eligible application of that idea." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1346 (Fed. Cir. 2018). The Court therefore holds that the '886 Patent is directed to an abstract concept, and that the steps described in the patent, individually or taken in ordered combination, do not provide an "inventive concept" rendering the abstract concept patentable. The '886 Patent is invalid.

ORDER RE: MOTION
TO DISMISS

## C. **Indirect Infringement Claims in Count I**[5]

Defendant seeks dismissal of claims for indirect infringement, asserted in Count I, in violation of 35 U.S.C. § 271(b), which provides "Whoever actively induces infringement of a patent shall be liable as an infringer." Defendant argues that these claims are insufficiently pled. The Federal Circuit has emphasized that "the general principles of *Twombly* and *Iqbal* must be applied to indirect infringement claims." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012) (citations omitted). Under this standard, a plaintiff must "plead facts 'plausibly showing that [defendant] specifically intended [its] customers to infringe the [patents-in-suit] and knew that the customers' acts constituted infringement.'" *Id.* at 1339. Furthermore, liability under § 271(b) "requires knowledge that the induced acts constitute patent infringement." *Id.*, citing *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765 (2011); *DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1306 (Fed. Cir. 2006) ("[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.").

In its First Amended Complaint, Plaintiff alleges, among other things, that "Kit Builder has also induced, and continue[s] to induce, infringement of the claims of the Patents-in-Suit by instructing others to use 3D Kit Builder, including, but not limited to, by selling or offering to sell 3D Kit Builder and by providing training and ongoing support on how to use 3D Kit Builder." FAC ¶19. Count I avers:

> 35. Kit Builder has indirectly infringed and continues to infringe claim 1 [of] the '280 Patent under 35 U.S.C. §271 (b), either literally or under the doctrine of equivalents, by actively inducing infringement of claim 1 by others. The direct infringement occurs when an individual uses 3D Kit Builder.

---

[5] Defendant also seeks dismissal of the indirect infringement claims in Count III, related to the '886 patent. Given the Court's ruling on the invalidity of the '886 patent, however, Defendant's motion on this point is moot.

ORDER RE: MOTION
TO DISMISS

36. Kit Builder has indirectly infringed and continues to infringe claim 1 of the '280 Patent under 35 U.S.C. §271 (g), either literally or under the doctrine of equivalents, by actively inducing infringement of claim 1 by others. The direct infringement occurs when an individual, without authority, imports, offers to sell or sells, or uses in the United States products made using 3D Kit Builder.

37. On information and belief, Kit Builder's active inducement has occurred with the specific intent of encouraging others to infringe the '280 Patent as demonstrated by, inter alia, promoting and advertising 3D Kit Builder, and instructing users to use 3D Kit Builder, in a manner that directly infringes the '280 Patent.

FAC ¶¶ 35-37.

The factual allegations in the First Amended Complaint are admittedly spare. Nevertheless, the Court concludes that the claims for indirect infringement, as recited above, contain the "short and plain statement" required under Rule 8(a). While Defendant argues that Plaintiff has failed to allege "facts plausibly showing that [Defendants] specifically intended [their] customers to infringe the [patents-in-suit]," its motion ignores the language in the FAC that "Kit Builder's active inducement has occurred with the specific intent of encouraging others to infringe the '280 Patent as demonstrated by, inter alia, promoting and advertising 3D Kit Builder, and instructing users to use 3D Kit Builder, in a manner that directly infringes the '280 Patent." While the claim is not exactly replete with details, it includes enough facts to put Defendant on notice of which product (3D Kit Builder) is allegedly infringing, what actions (promoting, advertising and instructing) Defendant is alleged to have taken in furtherance of this claimed infringement, and what customers (*e.g.* Samurai Sportswear, Ltd, FAC ¶20) were alleged to have been involved. This information is enough to enable Defendant to seek the discovery necessary to defend against this claim.

Plaintiff has also sufficiently alleged that Defendant knew its product infringed the patents-in-suit. *See* FAC ¶ 22 ("Kit Builder had actual knowledge of the Patents-in-Suit and of Kit Builder's infringement of those patents, at least as of October 29, 2018, when Kit Builder received

ORDER RE: MOTION
TO DISMISS

a notice letter regarding Infringement of Patents Owned by vPersonalize Inc from vPersonalize's undersigned counsel."). From the statements in the FAC, one may plausibly and reasonably (if not necessarily) draw the conclusion that Defendant "specifically intended its customers to infringe the [patents-in-suit] and knew that the customers' acts constituted infringement." *Bill of Lading*, 681 F.3d at 1339. Obviously, at this stage the Court makes no judgment on the merits of this claim. For purposes of a motion to dismiss, however, the Court must accept a true Plaintiff's allegations, however sparsely drawn. That portion of Defendant's motion seeking dismissal of Plaintiff's claims for indirect infringement of the '280 Patent is therefore denied.

### D. Count IV: Federal Defend Trade Secrets Act

Count IV of the First Amended Complaint is titled "Misappropriation of vPersonalize's Trade Secrets in Violation of the Defend Trade Secrets Act of 2016," ("DTSA"). FAC ¶¶54-61. That federal statute provides, in relevant part, "An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. §1836(b)(1). Plaintiff alleges "Kit Builder has acquired vPersonalize's trade secret through at least one third party (Inksewn) knowing or having reason to know that the trade secret was acquired by the third-party through improper means." FAC ¶ 55.

Defendant seeks dismissal of this count, asserting that it is a United Kingdom-based entity, and arguing in essence that the DTSA civil enforcement provision does not apply to foreign entities. Defendant argues in the alternative that even if the DTSA is found to apply to foreign entities, the DTSA cannot be applied to Kit Builder under the facts as alleged in the FAC. The Court disagrees on both counts.

ORDER RE: MOTION
TO DISMISS

First, 18 U.S.C. §1837 provides "This chapter," which includes the civil enforcement provision of § 1836, "also applies to conduct occurring outside the United States if . . . an act in furtherance of the offense was committed in the United States." Defendant argues that "offense" in this context refers only to the *criminal* offenses outlawed in Chapter 90, "Protection of Trade Secrets," which includes both civil and criminal enforcement provisions. Defendant argues, without authority, that "offense" is limited to criminal actions, and cannot be read to refer to civil actions, and that therefore the extra-territorial provision does not apply in a civil context such as here. The Court is not persuaded. Under Defendant's narrow interpretation of "offense," a plaintiff could never bring a civil enforcement action against a foreign entity, even one that had committed an offense in the U.S.

In addition, Defendant's position lacks the support of case law. The few cases the Court was able to identify on the subject assume (albeit without explicitly deciding) that the DTSA civil enforcement provision may be applied to a foreign entity. *See ProV Int'l Inc. v. Lucca*, No. 8:19-CV-978-T-23AAS, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019) (citing 18 U.S.C. § 1837(2) and dismissing civil DTSA claim against German and Brazilian defendants because "[t]he plaintiffs allege no facts showing that 'an act in furtherance of the offense was committed in the United States'); *Micron Tech., Inc. v. United Microelectronics Corp.*, No. 17-CV-06932-MMC, 2019 WL 1959487, at *8 (N.D. Cal. May 2, 2019), citing 18 U.S.C. § 1837 ("federal law provides for jurisdiction over misappropriation occurring outside the United States."); *Micron Tech., Inc. v. United Microelectronics Corp.*, No. 17-CV-06932-MMC, 2019 WL 266518, at *3 (N.D. Cal. Jan. 18, 2019) ("There is no dispute that a misappropriation claim under § 1836 can be based on "conduct occurring outside the United States" where "an act in furtherance of the offense was committed in the United States," *see* 18 U.S.C. § 1837."). In the absence of persuasive argument

ORDER RE: MOTION
TO DISMISS

to the contrary, and based on a plain reading of the statute, the Court holds that 18 U.S.C. §1837 authorizes civil enforcement actions against foreign entities to the same extent as criminal actions.

Defendant also argues that even if the DTSA does apply to foreign entities, Plaintiff has failed to allege facts supporting an inference that it, Kit Builder, committed an act in furtherance of the offense. The Court rejects Defendant's position for two reasons. First, the extraterritoriality provision of §1837(2) requires only that "an act in furtherance of the offense was committed in the United States." It pointedly (and the Court must assume intentionally) does not require the *defendant* to have committed such act. Plaintiff has alleged that "Kit Builder improperly obtained access to vPersonalize's proprietary product, patterns, software code and technical documents through at least one third-party, Inksewn USA Corp.," which Defendant acknowledges is an "act alleged to have been committed in the United States." FAC ¶ ¶ 27-28 ("Inksewn downloaded blank product patterns of all sizes of at least one product, women's sports bra, on May 14, 2018" and "Inksewn shared vPersonalize's proprietary patterns, technical documents, work order formats and workflows with [defendant]."); Mot. to Dis. at 13.

Second, even if the extraterritoriality provision is interpreted to apply only where the *defendant* has committed the proscribed act, Plaintiff has in fact alleged that Defendant committed acts constituting misappropriation in the United States. The DTSA defines "misappropriation" as (a) "acquisition of a trade secret" by a person who knows or should know the secret was improperly acquired or (b) "disclosure or use of a trade secret of another without express or implied consent …" 18 U.S.C. § 1839(5). In this case, Plaintiff alleges that Kit Builder "acquired" a trade secret through Inksewn USA, a U.S. company, and "used" that trade secret by offering its products and services, including 3D Kit Builder, throughout the United States. *See, e.g.,* FAC ¶ 26 ("Kit Builder improperly obtained access to vPersonalize's proprietary product, patterns, software code and

ORDER RE: MOTION
TO DISMISS

technical documents through at least one third-party, Inksewn USA Corp."); *see also* FAC ¶ 23 (alleging Defendant infringed the patents-in-suit "through its continued use, sale, and/or offer for sale of 3D Kit Builder to its customers in the United States."); FAC ¶ 25 (Defendant "has acted willfully and in disregard of vPersonalize's patent rights through its continued sale and/or offer for sale of 3D Kit Builder to companies in the United States."). Insulating a foreign defendant for the sole reason that a transaction occurred over the internet, rather than in a brick and mortar location, is untenable in the context of modern commerce. Dismissal of Plaintiff's DTSA claim is inappropriate at this time.

### E.  Count V: Washington Uniform Trade Secrets Act

In Count V Plaintiff invokes Washington's Uniform Trade Secrets Act, RCW 19.108.010 *et seq.* ("UTSA"). Defendant seeks dismissal of this count, on the grounds that none of the actions relevant to this lawsuit are alleged to have occurred in Washington, have been committed by or against a Washington resident, or otherwise merit the extraterritorial application of Washington law. Plaintiff responds that Kit Builder "conducts business throughout the United States, including Washington," and also refers to non-party Inksewn's business in the state. However, the FAC fails to allege that any of the activities at issue *in this litigation*, committed by vPersonalize, Kit Builder, or Inksewn, were conducted in Washington. Plaintiff merely speculates, without any factual allegations in support, that the Defendant's alleged activities have harmed Washington or its residents.

Neither the parties nor the Court could identify any case analyzing the extraterritorial reach of the Washington UTSA. Nevertheless, courts have noted that "a Washington law would not apply extraterritorially when neither party is a Washington resident and the acts giving rise to the claim occurred outside of Washington." *See Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 977 (9th

ORDER RE: MOTION
TO DISMISS

Cir. 2016), citing *Red Lion Hotels Franchising, Inc. v. MAK, LLC,* 663 F.3d 1080, 1090 (9th Cir. 2011). These are precisely the circumstances here. Plaintiff's Washington UTSA claim is accordingly dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismissed is GRANTED in part and DENIED in part. Counts III and V are DISMISSED, leaving Counts I and IV for another day.

Dated this 3rd day of February, 2020.


Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER RE: MOTION
TO DISMISS